Commonwealth of Pennsylvania, Pennsylvania Human Relations Commission *v.* Borough of Bendersville, the Borough Council, Dale E. Clark, Mayor, George Schriver, President of the Borough Council, Appellants.

Argued January 6, 1976, before President Judge BOWMAN and Judges CRUMLISH, JR., KRAMER, WILKINSON, JR., MENCER, ROGERS and BLATT.

504

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

*Walter W. Wilt*, with him *Hepford, Zimmerman & Swartz*, for appellants.

*Sanford Kahn*, General Counsel, for appellee.

OPINION BY JUDGE BLATT, May 17, 1976:

This is an appeal from a decision and order of the Pennsylvania Human Relations Commission (Commission) in which the Borough of Bendersville (Borough) and its governing officials (appellants) were found to have violated Sub-section 5(h)(3) of the Pennsylvania Human Relations Act[1] (Act) by denying building and sewage permits to Mr. Pedro Vega, thereby preventing him from constructing a commercial-residential building on his property.

In May of 1972, Mr. Vega purchased a tract of land in the Borough on which he desired to build a combined grocery store and four-bedroom residential structure for himself and his family. To construct this building he secured a building permit from the appropriate borough official on June 6, 1972. On June 29, 1972, he secured a sewage permit from another official, but this permit provided for the construction of a two-bedroom residential

---

1. Act of October 27, 1955, P. L. 744, *as amended*, 43 P. S. §955(h)(3).

structure only. This obvious discrepancy between the permits as to the nature of the structure to be erected apparently arose as a result of language difficulties between Vega, who is a citizen of Puerto Rican origin, and the official who issued the sewage permit. When, however, the Borough Council later learned that sewage permits for commercial structures could be issued only by the Pennsylvania Department of Environmental Resources, both sewage and building permits were revoked. It is apparently agreed by all herein concerned that strict compliance with state and local laws would have compelled the appellants to have denied issuing the permits to Vega in the first place. The Commission found, however, that appellants generally tolerated non-compliance with the laws here concerned but strictly enforced them against Vega because of his national origin. The Commission concluded, therefore, that the appellants had violated Subsection 5(h)(3) of the Act by discriminating against Vega because of his national origin, in furnishing services and privileges in connection with the ownership of "commercial housing."

In their appeal from the Commission's decision, the appellants argue that "commercial housing" is not involved in the case and that Sub-section 5(h)(3) would not apply. Sub-section 5(h)(3) provides:

"It shall be an unlawful discriminatory practice . . .

"(h) For any person to:

"(3) *Discriminate against any person* in the terms or conditions of selling or leasing any commercial housing or *in furnishing facilities, services or privileges in connection with the ownership, occupancy or use of any commercial housing* because of the race, color, religious creed, ancestry, sex, national origin or handicap or disability of any present or prospective owner, occupant or user of such commercial housing or to discriminate against any person in the terms of leasing any commercial housing or in furnishing facil-

ities, services or privileges in connection with the occupancy or use of any commercial housing due to use of a guide dog because of the blindness of the user." (Emphasis added.)

Commercial housing is defined in Section 4(j) of the Act, 43 P. S. §954(j) as follows:

"(j) The term 'commercial housing' means *housing accommodations held or offered for sale or rent* (1) by a real estate broker, salesman or agent, or by any other person pursuant to authorization of the owner; (2) by the owner himself; or (3) by legal representatives, but shall not include any personal residence offered for rent by the owner or lessee thereof, or by his broker, salesman, or employe." (Emphasis added.)

It is clear that the housing which Vega planned to construct is not to be offered for sale or rent but is to be used strictly as a personal residence for himself and his family. The Commission argues, however, that Sub-section 5(h)(3) does apply because housing need not be offered for sale or rent but need only be "held" by one of the persons designated in clauses (1), (2) and (3) above, apparently for any reasons whatever including the owner's personal non-commercial use.

Such a construction, we believe, strains all imagination and would lead to an absurd anomaly of statutory construction. If the legislature had intended housing with no commercial attributes whatsoever to fall within the definition of "commercial housing," why did it use the word "commercial" to modify the word "housing"? It seems obvious to us that the legislature intended "commercial housing" to mean housing either *held for sale or rent* or *offered for sale or rent,* and that Mr. Vega's property does not fall within either of these categories. It is not, therefore, subject to the protection of Sub-section 5(h)(3) of the Act.

We, of course, have not overlooked the fact that all six of the subsections under Section 5(h) of the Act involve antidiscrimination provisions in connection with commercial housing and that the discriminatory practices enumerated therein may lack reasonable statutory remedies when they occur in connection with non-commercial housing. Unfortunately, however, neither the Commission nor the courts can provide such protections absent a proper legislative mandate. *Cf. Pennsylvania Human Relations Commission v. St. Joe Minerals Corporation Zinc Smelting Division,* 24 Pa. Commonwealth Ct. 455, 357 A.2d 233 (1976).

We, therefore, issue the following

## ORDER

AND, NOW, this 17th day of May, 1976, the decision and order of the Pennsylvania Human Relations Commission is hereby reversed.

Judge KRAMER did not participate in the decision in this case.